**STANDARD OIL CO. OF NEW JERSEY v. UNITED STATES et al.**

District Court, S. D. Alabama, S. D.    April 13, 1928.

1. States ⊙⟹203—State Docks Commission need not sue in name of state in connection with its ordinary business affairs (Acts Ala. 1927, p. 1).

State Docks Commission, created under Acts Ala. 1927, p. 1, and given power by section 7 to use the name of the state in "all such suits, actions, and other legal proceedings as may be proper or necessary for the enforcement of the rights of the state growing out of any of its transactions or operations authorized by this act," does not require commission to sue in name of state in cases involving its ordinary business affairs in operating docks, warehouses, terminals, terminal railroads, and carrying on other business.

2. States ⊙⟹191(1)—State Docks Commission carrying on business relating to pilots, terminals, and transportation is not exempt from suit in cases arising out of its ordinary business affairs (Acts Ala. 1927, p. 1).

Where cause of action against State Docks Commission created by Acts Ala. 1927, p. 1, arises out of ordinary business affairs of the commission in its business operations in connection with transportation, warehousing of goods, and furnishing pilots, commission is subject to suit, though it would be exempt in case cause of action arose from performance of one of its public functions.

3. States ⊙⟹191(1)—State agency authorized to conduct ordinary business ventures is subject to suit.

Where the state creates a commission or other agency which it authorizes to conduct ordinary business ventures, such agency may be sued regardless of whether the state expressly authorizes suit against it, inasmuch as such liability arises from the business which it conducts.

4. Courts ⊙⟹303(2)—State Docks Commission held not exempt from suit as state agency in libel proceeding arising from collision resulting from alleged negligence of pilot which it furnished (Acts Ala. 1927, p. 1; Admiralty Rule 56; Const. Ala. 1901, §§ 13, 35; Const. U. S. Amend. 14).

State Docks Commission created by Acts Ala. 1927, p. 1, and given authority to operate seaports, wharves, piers, docks, warehouses, and terminals, and to operate as common carrier and to hire employees, *held* subject to suit by citation under Admiralty Rule 56 in libel proceeding for collision for negligence of employee which commission furnished to pilot steamer, commission not being exempt as state agency under Const. Ala. 1901, §§ 13, 35, and Const. U. S. Amend. 14, though it was not authorized or required to issue stock, and though act creating commission did not expressly authorize suits against it.

5. States ⊙⟹112—State Docks Commission held not exempt from liability for negligence of employee furnished by it to pilot vessel on ground pilot was engaged in public function (Acts Ala. 1927, p. 1).

Where State Docks Commission created by Acts Ala. 1927, p. 1, employed pilot and collected fee for his services in moving vessel, commission was not exempt from liability for pilot's negligence on ground that pilot was engaged in a public function.

In Admiralty. Libel by the Standard Oil Company of New Jersey against the United States and others, in which the State Docks Commission and Thomas E. Dorgan, having been impleaded, filed pleas to the jurisdiction, to which the government excepted. Exceptions sustained.

Pillans, Cowley & Gresham, of Mobile, Ala., for libelant.

Alex C. Birch, U. S. Atty., of Mobile, Ala., and J. E. Meredith, Asst. U. S. Atty., of Foley, Ala., for the United States.

Steven, McCorvey, McLeod, Goode & Turner, of Mobile, Ala., Thomas C. McClellan, of Birmingham, Ala., and S. Palmer Gaillard, Jr., of Mobile, Ala., for State Docks Commission and Dorgan.

ERVIN, District Judge. This was a libel in admiralty against the United States under the suits in Admiralty Act (46 USCA §§ 741–752; Comp. St. §§ 1251¼–1251¼k), as in rem, for an injury to the steamer Bostwick, caused by a collision with the steamer Casey, a Shipping Board Emergency Fleet Corporation vessel, and against the tugs Buzzard and Nimrod, and the Mobile Towing & Wrecking Company, their owner, the Todd Shipbuilding & Dry Dock Company, and the State Docks Commission.

The Casey was being shifted in the Mobile river to a slip of the Todd Shipbuilding Company on the west side of the river where the Bostwick was already moored on the south side of the slip. The Casey was under the command of T. E. Dorgan, a licensed pilot in Mobile, during the shifting, and Dorgan was employed by the State Docks Commission, who paid him a fixed salary and charged and received certain fees for the services rendered by the pilots in Mobile river.

Dorgan and the State Docks Commission were cited in by the United States under the fifty-sixth admiralty rule, and it was charged that the collision was caused by the negligence of Dorgan and the commission was sought to be held as his employer because

they furnished him upon request and for pay to pilot the Casey during the maneuver.

The State Docks Commission and Dorgan, on being cited in by the United States, filed pleas to the jurisdiction, setting up that the commission was created by an act of the Legislature of Alabama and that neither it nor its officer was suable in this court, that it is only an agency of the state of Alabama, and that a suit against it was a suit against the state. The United States filed exceptions to the pleas and a submission was taken on such exception.

The act is found on pages 1 to 14, Acts of Alabama 1927.

I quote so much of the act as seems necessary for the determination of the question:

"Section 1. The authority and power granted the state of Alabama in act approved September 18, 1923 (which act is codified as chapter 44, article 4, in the Code of 1923), to engage in, through the agency hereinafter provided and designated and such other agencies as hereafter may be provided by law, works of internal improvement of promoting, developing, constructing, maintaining, and operating all harbors or seaports within the state, or its jurisdiction, including the acquisition or construction, maintaining and operating at seaports of harbor water craft and terminal railroads, as well as all other kinds of terminal facilities, provided that such work or improvement and facilities shall always be and remain under the management and control of the state through the governing agency hereinafter provided and designated, or such other governing agency or agencies as hereinafter may be provided by law. * * *

"Sec. 2. The said State Docks Commission is hereby provided and designated as the agency of the state through which it shall accomplish the acquisition, or construction, maintenance and operation of all of the improvements and facilities hereby authorized and through which the same shall be managed and controlled by the state, and hereinafter such agency shall be called the commission. * * *

"Sec. 3. The jurisdiction of the commission in any harbor or seaport within the state shall extend over the waters and shores of such harbor or seaport and over that part of all tributary streams flowing into such harbor or seaport in which the tide ebbs and flows, and shall extend to the outer edge of the outer bar at such harbor or seaport."

"Sec. 5. The commission must appoint a secretary-treasurer and as occasion requires may appoint such pilots, clerks, attorneys, collectors and other employees as may be necessary to perform all services needed in bringing vessels in and out of the seaport or harbor, loading and unloading such vessels, and in operating the terminal facilities provided for in this act. * * *

"Sec. 6. The said commission shall constitute a board of commissioners of pilotage for any seaport or harbor within the state and shall issue state licenses to such applicants as are qualified in the opinion of the commission to navigate such seaport or harbor and in such numbers as the proper service of such seaport or harbor renders necessary. The said commission shall issue rules and regulations concerning the examination and qualifications of pilots for the above special service and shall investigate all charges as to violation of general rules and regulations of the port and as to dereliction of duty or incompetency on the part of such pilots and said commission is hereby vested with the power to suspend such pilots or to withdraw such pilots' licenses for cause. The State Docks Commission is hereby authorized within the power of the state to establish and enforce rules and regulations concerning pilotage and to fix the pilotage fees for piloting vessels across the outer bar and into any harbor or seaport and between points in such harbor or seaport.

"Sec. 7. The state, in engaging in the work of internal improvement, of promoting, developing, constructing, maintaining, and operating harbors or seaports within the state and its jurisdiction, acting through the said commission, shall have power to acquire, purchase, install, lease, construct, own, hold, maintain, equip, use, control, and operate at seaports, wharves, piers, docks, quays, grain elevators, cotton compresses, warehouses and other water and rail terminals and other structures, and facilities needful for the convenient use of the same in the aid of commerce including the dredging of approaches thereto. * * * The state through the said commission shall have power to acquire, own, lease, and operate tug and pilot boats, to locate, install, construct, acquire, lease, own, hold, maintain, control, and operate at seaports a line of terminal railroads with necessary sidings, turnouts, spurs, branches, switches, yard track, bridges, trestles, and causeways and in connection therewith or appurtenant thereto shall have the further right to lease, install, construct, acquire, own, maintain, control and use any and every kind or character of motive power and conveyances or appliance necessary or proper to carry passengers, goods, wares, and merchandise

over, along or upon the tracks of such railroads or other conveyances. The state, acting through the said commission, shall have the right and authority with its terminal railroads to connect with or cross any other railroad upon the payment of just compensation and to receive, deliver to and transport the freight, passengers, and cars of common carrier railroads as though it were an ordinary common carrier. The title to all property acquired under the authority of this act shall vest in the state of Alabama, but the commission, with the consent and approval of the Governor, may dispose of, sell or lease to others, at reasonable prices and for reasonable compensation, any of said property, equipment and facilities; provided that the proceeds of all such sales shall be returned to capital account. The proceeds from all leases shall become a part of the operating fund. * * * The power of eminent domain shall apply, not only as to all property of private persons or corporations, but also as to property already devoted to public use, provided, however, the said commission shall have no authority to acquire without the consent of the owner thereof any property now operated and used for port purposes or such purposes as the commission is authorized to acquire and use property for, unless an actual necessity therefor be alleged and proven. * * * The commission with the approval of the Governor is hereby authorized to bring and prosecute, for and in the name of the state, all such suits, actions, and other legal proceedings as may be proper or necessary for the enforcement of the rights of the state growing out of any of its transactions or operations authorized by this act. * * *"

"Sec. 9. The operation of all harbors and seaports within the state and the improvements and facilities hereby authorized shall be conducted in the name of the State Docks Commission. In such operation, the commission may contract such current indebtedness as is necessarily incident to the prosecution of the work in accordance with the terms of this act. The commission may adopt rules not inconsistent with the provisions of this act for the purpose of regulating, controlling and conducting the said operation.

"Sec. 10. The state, at the request of the commission approved by the Governor, may borrow from time to time such sums of money as may be immediately necessary in its general operation, or in the development and improvements hereby authorized, or for the payment of interest on outstanding bonds or other indebtedness lawfully incurred; and

the commission, subject to the approval of the Governor, acting by and through its chairman and secretary-treasurer, is hereby empowered to execute notes or other like obligations of the state, but in its own name, for all sums so borrowed. * * *

"Sec. 11. It is intended to so provide that all of the revenues and income arising from the operations authorized hereby and from all property acquired under the provisions hereof shall be devoted to the payment of the expenses of such operation, to the payment of interest upon the bonds issued pursuant to the provisions hereof, and to the payment of the principal of said bonds as they respectively mature, thus relieving the other revenues of the state from any burden in that behalf unless the aforesaid income be insufficient for the purposes mentioned. The commission may retain from the money coming into its hands such amount as may reasonably be required for operating capital, and all amounts so retained shall be deemed to be an operating expense within the meaning of this act."

"Sec. 14. In order to enable the said operation to earn funds to pay operating expenses and interest on the bonds and to create a sinking fund for the retirement of the bonds, the said commission shall have the right and power to fix from time to time reasonable rates of charges for all services and for the use of all improvements and facilities provided under the authority of this act, and schedules of all rates so fixed shall be filed with the State Public Service Commission within seven days after the fixing thereof. All private concerns, corporations or individuals operating similar facilities at Alabama seaports must make and collect charges which shall be not less than the charges so fixed by the said commission for the use of the state's facilities."

"Sec. 18. Said commission is hereby authorized to formulate and promulgate rules and regulations for the operation of any seaport or harbor within the state. Any person, firm, association, or corporation violating any of the rules and regulations so established shall be guilty of a misdemeanor. * * *"

"Sec. 20. The commission may establish harbor lines, exterior and interior, when not in conflict with similar lines established by the United States. The said commission is hereby empowered to grant licenses in the name of the state to any riparian owner for the construction of wharves, booms, and other aids to navigation when such wharves, booms or aids are appurtenant to his upland."

We see that the act creates a corporate entity called the State Docks Commission and confers on it most extensive powers both public and private.

It is given jurisdiction over the harbor and all tributary streams flowing into it. It is a board to fix and grant licenses to the pilots and to make the rules to regulate them. To fix and collect the pilotage fees to be paid by all vessels coming into the harbor, and to make and enforce rules to regulate the harbor. To fix and collect charges for all services and for the use of all improvements and facilities provided under the act. To establish harbor lines both exterior and interior. To make rules for operation of the port, and violations of such rules are made a criminal offense. To fix and pay the compensation to its officers and employees. It is also given the power of eminent domain.

In addition to these public powers, the private right is given it to acquire, purchase, install, lease, construct, own, hold, maintain, equip, use, control, and operate seaports, wharves piers, docks, quays, grain elevators, cotton compresses, warehouses, and other water and rail terminals and other structures and facilities needful for the convenient use of the same in the aid of commerce, including the dredging of approaches thereto. To acquire, own, lease, and operate tug and pilot boats, to locate, install, construct, acquire, lease, own, hold, maintain, control, and operate at seaports a line of terminal railroads with all powers to transport passengers, freight, and cars of other railroads. It is made a common carrier, and given the right to agree with other common carriers as to the movement of freight and divisions of the freight, and the apportionment of the pay for carriage. To borrow money and make notes. It is also expressly given the right to sue in the name of the state in certain contingencies. Under the broad business powers given, there is scarcely any business connected with a port it cannot engage in.

Would it not be expecting too much to assume that in all these lines of human endeavor where private parties have so many disputes and controversies, this commission would be able to always satisfactorily adjust its misunderstandings without litigation?

Did the Legislature expect that the commission in its management, or its various agents and servants, would be so perfect that there would arise no controversies that would require the aid of the courts to adjust?

If not, was it considered that the other party to this business controversy should accept the ruling of the commission without the right of appeal to the courts?

Suppose the commission had goods on storage in its warehouse that it refused to deliver but undertook to convert to its own use. In Hopkins v. Clemson College, 221 U. S. 646, 31 S. Ct. 657, 55 L. Ed. 890, 35 L. R. A. (N. S.) 243, it is said: "If the state had in so many words granted the college authority to take or damage the plaintiff's property for its corporate advantage without compensation, the Constitution would have substituted liability for the attempted exemption."

The Constitution of Alabama provides:

Section 35. "The sole object and only legitimate end of government is to protect the citizen in the enjoyment of life, liberty and property, and when the government assumes other functions, it is usurpation and oppression."

Section 13. "That all courts shall be open; and that every person, for any injury done him, in his lands, goods, person or reputation, shall have a remedy by due process of law."

The Fourteenth Amendment to the Constitution of the United States provides: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law."

Surely it was contemplated that if a dispute arose between the commission and the other party to a contract or agreement either as to the real meaning of such agreement or as to the correct amount to be paid under such agreement, such other party had equal rights under the law to have the courts pass upon the question. What greater oppression to the citizen than to deny him this right!

Had the act expressly denied him this right, would not such denial have violated sections 35 and 13 of the Alabama Constitution as well as that of the United States? Hopkins v. Clemson College, supra.

[1] Certainly if the commission has sufficient entity to sue, it can also be sued. But it will be said that the power given to sue was in the name of the state. That is true, and that is one of the very reasons that suggest to me the Legislature overlooked the general authority to sue and be sued, because the power given to use the name of the state in "all such suits, actions, and other legal proceedings as may be proper or necessary for the *enforcement of the rights* of the state growing out of any of *its* transactions or operations authorized by this act" (italics mine) suggests to my mind the idea that, where its

public functions were to be enforced, it should have the right to sue in the name of the state, or where the right grew out of a transaction or operation by the state it could do so.

The pronoun "its" refers to the state and not to the commission. It is not required or compelled to sue in the name of the state, but with approval of the Governor it was authorized to do so. Would it not seem trivial and burdensome to require the approval of the Governor to sue a ship to collect a pilotage fee, or a charge for compressing 100 bales of cotton, or a bill for the storage of 1,000 barrels of molasses? This requirement, if so understood, would greatly hamper and impede the business of the commission.

Suppose a controversy should arise with one of the railroads exchanging freight as to the meaning of certain terms of the agreement or as to the proper apportionment of the freight charges and the right of the railroad to a fair hearing in the courts is denied. Would it not work against the port by making all the railroads route their freight to other ports? Suppose a controversy arose with a ship, and it was denied the access to the courts. Would it bring freight to this port again, or would other ships or shippers in face of such a holding do so? Suppose a controversy arose with a shipper whose goods were stored in the dock's warehouse, and he was denied access to the courts to present his contentions. Would he again store or route other goods through this port?

It seems to me that if followed through to the effect of the ruling asked, it would be the worst thing that could be asked for the real business interests of the commission. Suppose, too, that the commission should establish rules or rates under section 14 that were felt to be unfair or confiscatory to private business concerns. What is there in this act that differentiates this commission from the Railroad Commission, where the Supreme Court held they could be sued and such suit was not one against the state. Reagan v. Farmers' Loan & Trust Co., 154 U. S. 362, 14 S. Ct. 1047, 38 L. Ed. 1014; McNeill v. Southern R. R., 202 U. S. 543, 26 S. Ct. 722, 50 L. Ed. 1142; Mississippi Railway Commission v. Ill. R. R., 203 U. S. 335, 27 S. Ct. 90, 51 L. Ed. 209.

The state of Alabama is not a party to the record, but it is conceded that Osborn v. Bank of U. S., 9 Wheat. 738, 6 L. Ed. 204, has been modified by later cases to the extent that where the officers and agents of the state were acting in a public function, a suit against one of them was a suit against the state, or where they represent the state in such a manner as a judgment against such officer has the effect to compel the state to specifically perform its contracts then the suit is against the state, though it is not a party to the record. Ex parte State of N. Y., 256 U. S. 490, 41 S. Ct. 588, 65 L. Ed. 1057.

Does this case fall under either of these classes?

What public function was the Docks Commission performing in furnishing for pay a pilot to navigate the Casey to her berth? The regulations had all been passed and were being complied with in this manner, the same as if the pilot were furnished by any other private individual or company. The question arose, not on the passage of a regulation, but in its performance. Did the state make any contract to furnish the pilot, or does this action have the effect of compelling it to carry out any contract?

The state, in the act, authorized the Docks Commission to employ and furnish pilots for pay. This is not an employment and furnishing by the state, for the Docks Commission had authority to hire and pay employees, and to contract in its own name in all the various lines of endeavor it was authorized to conduct.

It seems to me to be immaterial whether the state has expressly authorized suit against the Docks Commission.

[2] If the cause of action arose from the exercise by the commission of one of the public functions, then the commission would be in the place of the state and exempt to the same extent; but when the cause of action arose from an exercise by the commission of one of the ordinary business affairs it was authorized to conduct, then it was subject to suit.

[3] Where the state creates a commission or other agency and authorizes it to conduct ordinary business ventures, it is immaterial whether the state expressly provides that it may be sued, for such liability arises from the business it is authorized to conduct.

This is what I understand to be the holding in Bank of U. S. v. Planters' Bank of Ga., 9 Wheat. 904, 6 L. Ed. 244.

[4] This is not a suit against the state, but one against the commission created by the state. When the state made a common carrier, a warehouseman, a cotton compressor, an operator of a grain elevator, a wharfinger and an employer and furnisher of pilots for pay, of the Docks Commission, it necessarily subjected it to the same rules as to suit that other persons and corporations engaged in those various occupations were subject to.

Section 9 provides for the operation of

all the various businesses in the name of the State Docks Commission, and then says, "in such operation, the commission may contract such current indebtedness as is necessarily incident to the prosecution of the work in accordance with the terms of this act." Section 10 authorizes the commission to give notes in its own name. By section 11, all revenues and incomes from the operations are devoted to the payment of the expenses of operation and the payment of principal and interest of the bonds as they mature, and then says, "The commission may retain from the money coming into its hands such amount as may reasonably be required for operating capital, and all amounts so retained shall be deemed to be an operating expense within the meaning of this act." Surely it was contemplated that the commission should pay the debts it contracted and the notes it gave in the ordinary course of its operations.

I conclude therefore that as to the various lines of private endeavor the state has authorized the State Docks Commission to engage in and conduct, it has by the act made it a corporation to run these ventures for the benefit of the state of Alabama.

It is not necessary that it be authorized or required to issue stock. Had it done so and then taken all of the stock, we would have just such a corporation as the Emergency Fleet Corporation, where the United States owns all the stock. The opinion of Justice Holmes in Sloan Shipyards v. U. S. Fleet Corp., 258 U. S. 564, 42 S. Ct. 386, 66 L. Ed. 762, is very applicable to the question I am considering.

[5] Again, it is said that T. E. Dorgan, the pilot, while acting as pilot was engaged in a public function, the same as a policeman, and that the State Docks Commission is not liable as his employer for any negligence he may have been guilty of. Hopkins v. Clemson College, 221 U. S. 646, 31 S. Ct. 654, 55 L. Ed. 890, 35 L. R. A. (N. S.) 243.

If this were a common-law suit that rule would apply, but it is expressly held in Workman v. Mayor of N. Y., 179 U. S. 556, 21 S. Ct. 212, 45 L. Ed. 314, that this rule does not apply in admiralty. That case is followed in Harris v. Dist. of Columbia, 256 U. S. 654, 41 S. Ct. 610, 65 L. Ed. 1146, 16 A. L. R. 1471, where the distinction between the rule at common law and in admiralty is recognized.

In the Workman Case it is said on page 563 (21 S. Ct. 216), "Admiralty courts must administer redress for every maritime wrong in every case where they have jurisdictional power over the person by whom the wrong has been committed," and on page 565 (21 S. Ct. 217), "And that under the general maritime law, where the relation of master and servant exists, an owner of an offending vessel committing a maritime tort is responsible, under the rule of respondeat superior, is elementary. Thorpe v. Hammond (1871) 12 Wall. 408 [20 L. Ed. 419]; The Plymouth (1866) 3 Wall. 35 [18 L. Ed. 125]."

It seems to me this rule should be applied where the pilot was in the employ of the commission who collected the fee for his services in moving a vessel furnished him to act as pilot of the operation.

The exceptions will be sustained to the pleas to the jurisdiction.